## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RONALD POLIDORI, | CASE NO. 3:13-cv-02181-GBC |
| Plaintiff, | |
| v. | (MAGISTRATE JUDGE COHN) |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | MEMORANDUM |
| Defendant. | Docs. 1, 7, 8, 9, 10 |

### I.   Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying the application of Plaintiff Ronald Polidori for disability insurance benefits ("DIB") under the Social Security Act, 42 U.S.C. §§401-433 (the "Act"). In his appeal, Plaintiff asserts that his back impairments preclude him from engaging in the limited range of light work the ALJ found he could perform. In support of this claim, he presents a single allegation of error by the ALJ: his failure to give controlling weight to the opinion of Plaintiff's treating physician, Dr. Robert Mathews.  However, the ALJ properly discounted this opinion on the grounds that it was internally inconsistent and incoherent. Moreover, an ALJ can assign controlling weight only to treating source opinions that are both well-supported and not contradicted by other evidence. Here, Dr. Mathews' opinion was contradicted by the vast majority of other evidence, including Plaintiff's report that epidural steroid injections considerably improved his pain and his lack of treatment thereafter. Plaintiff also refused to follow any of his physiatrist's treatment recommendations and was treating his

back pain only with over-the-counter aspirin and home stretching exercises at the time of the hearing. The Court reviews an ALJ's denial of benefits under the substantial evidence standard, where a decision stands if any reasonable mind could accept the relevant evidence as adequate to deny benefits. Here, despite Plaintiff's medically determinable impairments and objective physical abnormalities, a reasonable mind could accept the ALJ's reasoning as adequate in rejecting Dr. Mathews' opinion and concluding that Plaintiff can engage in a limited range of light work. For all of the foregoing reasons, the Court will deny Plaintiff's appeal.

## II.   Procedural Background

On July 22, 2010, Plaintiff filed an application for DIB under Title II of the Social Security Act. (Tr. 110-11). On October 18, 2010, the Bureau of Disability Determination denied this application (Tr. 74), and Plaintiff filed a request for a hearing on October 24, 2010. (Tr. 97). On September 16, 2011, an ALJ held a hearing at which Plaintiff—who was represented by an attorney—and a vocational expert appeared and testified. (Tr. 12-46).  On November 7, 2011, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 76-91). On November 17, 2011, Plaintiff filed a request for review with the Appeals Council (Tr. 9-11), which the Appeals Council denied on June 21, 2013, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-5).

On August 19, 2013, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On October 31, 2013, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 7, 8). On December 2, 2013, Plaintiff filed a brief in support of his appeal ("Pl. Brief"). (Doc. 9). On December 27, 2013, Defendant filed a brief in response ("Def. Brief"). (Doc. 10). On May 1,

2014, the Court referred this case to the undersigned Magistrate Judge. Both parties consented to the referral of this case for adjudication to the undersigned Magistrate Judge on June 13, 2014, and an order referring the case to the undersigned Magistrate Judge for adjudication was entered on June 18, 2014. (Doc. 12, 13).

### III.     Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Johnson v. Commissioner of Social Sec., 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence is a deferential standard of review. See Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence." Pierce v. Underwood, 487 U.S. 552, 564 (1988). Substantial evidence requires only "more than a mere scintilla" of evidence, Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999), and may be less than a preponderance. Jones, 364 F.3d at 503. If a "reasonable mind might accept the relevant evidence as adequate," then substantial evidence supports the Commissioner's determination. Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999); Johnson, 529 F.3d at 200.

### IV.     Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §

423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. See 20 C.F.R. § 404.1520; see also Plummer, 186 F.3d at 428. If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. See 20 C.F.R. § 404.1520. The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings"); (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. See 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four. If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. Mason v. Shalala, 994

F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the plaintiff. See 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

## V. Relevant Facts in the Record

Plaintiff was born on September 28, 1957 and was classified by the regulations as a person closely approaching advanced age through the date of the ALJ decision. 20 C.F.R. § 404.1563. (Tr. 34). He has a limited education and past relevant work as a truck driver/machine operator. (Tr. 40). Plaintiff's alleged onset date is January 15, 2010.

Plaintiff was rear-ended in an auto accident on January 15, 2010, and he reported that this caused him back and neck pain. (Tr. 173). On January 20, 2010, x-rays on Plaintiff's lumbar spine indicated a possible pars defect with no subluxation and moderate facet arthropathy, but no evidence of an acute compression fracture. (Tr. 320). X-rays of Plaintiff's cervical spine indicated spinal stenosis and possible neural foramina stenosis due to osteophytes, degenerative disc disease most prominent at C6-C7. (Tr. 325). There was no fracture or dislocation. (Tr. 325). On January 27, 2010, an MRI of Plaintiff's lumbar spine indicated mild degenerative disc disease with areas of minor lateral recess narrowing in the lumbar spine, with no large focal disc protrusion or direct nerve root impingement. (Tr. 321-22). An MRI of Plaintiff's cervical spine indicated "[m]ild multilevel spondylitic changes with varying degrees of mild central stenosis and mild to moderate foraminal encroachment." (Tr. 324).

Jennifer Ofcharsky, M.P.T., evaluated Plaintiff for physical therapy on February 8, 2010. (Tr. 174). Plaintiff reported constant neck and back pain exacerbated by sitting, driving, and standing in one place. (Tr. 173). He reported that his pain radiated into his left hip and cheek, but not all along the leg. (Tr. 173). Plaintiff had multiple objective symptoms, including decreased

range of motion, decreased strength in his upper extremities, positive straight leg raises on the right and left, muscle spasm, and tenderness to palpation. (Tr. 173-74). He reported that he was self-employed, working as a truck driver in the winter and as a landscaper in the summer. (Tr. 173). He had "no restrictions from the doctor." (Tr. 173). He was prescribed physical therapy three times a week for four weeks. (Tr. 174).

On March 10, 2010, notes indicate that Plaintiff was "progressing slowly" and he was prescribed another three weeks of physical therapy. (Tr. 185). He completed a Neck Disability Index and a Low Back Questionnaire for physical therapy. He indicated that he could look after himself normally and lift heavy weights, but it caused him extra pain. (Tr. 176, 178). He indicated that he could not read as much as he would like because of moderate pain in his neck, but that he had no difficulty concentrating. (Tr. 176-77). He indicated that he could drive a car for as long as he wanted with moderate pain in his neck, was able to engage in recreational activities with "some pain" in his neck, and that his sex life was normal but caused extra pain. (Tr. 177, 179). With regard to his back pain, he indicated that "[t]he pain is bad, but I manage without taking pain killers." (Tr. 178). He indicated that pain prevents him from "walking more than 1 mile" and from sitting for more than 10 minutes, but that he can stand "as long as [he] want[s]" with extra pain. (Tr. 178-79). He indicated that "[p]ain has no significant effect on my social life, apart from limiting more energetic interests (i.e. dancing)" and that his "[p]ain is bad, but [he] manage[s] journeys of over 2 hours." (Tr. 179). However, he indicated that he could not do his normal work. (Tr. 177). Plaintiff completed another Neck Disability Index and Low Back Questionnaire on March 30, 2010. (Tr. 186-190). It was unchanged, except that Plaintiff indicated that "[p]ain prevents me from lifting heavy weights off the floor, but [he] can manage

if they are conveniently positioned (i.e. on a table)," that he could not drive his car as long as he wanted because of moderate neck pain, and that he was able to engage in "some but not all of [his] usual recreational activities." (Tr. 186, 189).

On April 7, 2010, Plaintiff reported that he was "crippled" over the weekend after his physical therapy session and wished to be "placed on hold due to pain." (Tr. 183). Plaintiff was discharged from physical therapy on April 27, 2010 after he "never rescheduled." (Tr. 191).

On April 9, 2010, Dr. Scott Epstein, M.D., performed a physiatric consultation on Plaintiff. (Tr. 333-335). Plaintiff reported that his pain had increased after his last physical therapy session and that driving, lying on his back, bending forward, and sitting exacerbated his symptoms. (Tr. 333). He had "mild cervical and lumbar strain findings on exam" but his neurologic exam was negative and he had no findings suggestive of radiculopathy. (Tr. 335). Dr. Epstein also reviewed Plaintiff's x-rays from January 20, 2010 and his MRIs from January 27, 2010. (Tr. 334). Dr. Epstein explained that Plaintiff "declined all treatment options. Recommended consideration for non-steroidals, physical therapy, chiropractic acupuncture, and injections; [Plaintiff] declined them all." (Tr. 335). He also noted that Plaintiff was "requesting note to stay out of work at infinitum. I did not feel comfortable doing this because he was declining any and all treatment recommendations." (Tr. 335).

On May 4, 2010, Plaintiff was treated for chest pain. (Tr. 194). Plaintiff reported that he had been working on a motor in the back of his truck and that he was "very active, functional, and independent, although not employed at present." (Tr. 194). Notes indicated that he had presented with similar symptoms on January 1, 2010, and had been discharged to follow-up with his primary care physician and obtain a stress test, but he never did. (Tr. 196). Except for chest

pain, his exam was "essentially completely benign." (Tr. 194). He specifically denied a past history of musculoskeletal disorders and he did not mention back pain. (Tr. 236). His back exam was normal, with no tenderness and a normal range of motion in his extremities. (Tr. 237). His discharge summary indicates that:

> Throughout the patient's hospital stay, the patient was quite anxious to leave. He was again anxious to leave on the morning of 5/5, but I encouraged him to stay until his stress test, and he did agree to stay until approximately 1:30 p.m. until his stress test results were available. However, despite having the stress test results at 1 o'clock, we attempted to see the patient, and the patient was gone. It appears the patient went home and walked out of the hospital after pulling out his IV with no follow up.

(Tr. 196).

Dr. Robert Mathews evaluated Plaintiff for back pain on May 24, 2010. (Tr. 303). Plaintiff reported that he had recurrent lower back pain but that "pot" relieves his pain. (Tr. 303, 313). He indicated that he had been a truck driver, but was laid off, and that he cuts wood in the summertime. (Tr. 303). Dr. Mathews noted that Plaintiff's MRI showed no major disc disruption, fracture, or dislocation, although he did have "some aging of his spine." (Tr. 313). He had no major neurological symptoms, but did have "flashes of left leg sciatic neuritis." (Tr. 313). He reported recent weight loss, chest pain, anxiety, depression, and cold toes. (Tr. 313). He reported that coughing, sneezing, laughing, sitting, standing, bending, and exercise exacerbate his pain. (Tr. 313). He had evidence of cervical vertebral syndrome. (Tr. 314). He had some restricted range of motion but normal strength. (Tr. 314). His gait was "stable and coordinated." (Tr. 314). Dr. Mathews ordered a new MRI and scheduled a follow-up visit. (Tr. 303).

On June 14, 2010, Plaintiff saw Dr. Mathews to go over the MRI. (Tr. 302). He had a positive straight leg raise. (Tr. 309). He noted that the MRI indicated degeneration with annulus bulging, a central acute herniated disc with an annulus tear in the midline with compression of

the anterior lateral thecal sac and "possible nerve root compression." (Tr. 309, 311). His cervical MRI indicated stenosis, mild central and foraminal encroachment and disc herniation. (Tr. 309, 311). Upon reviewing the MRI, Dr. Mathews prescribed a series of three lumbar epidural steroid injections, opining that they should give him "good relief." (Tr. 302, 309). Plaintiff had epidural injections on June 15, 2010, June 29, 2010, and Jul6 6, 2010, and tolerated the procedures well. (Tr. 265-281, 283-288, 319). In a follow-up phone call on June 17, 2010, Plaintiff reported that he had only "slight" pain and felt a "little better," except at the site of the injection. (Tr. 282).

Plaintiff continued seeing Dr. Mathews, reporting lower back pain, through August 2, 2010. (Tr. 300). On August 2, 2010, he reported that his "epidural program…has helped his back pain considerably along with a spine and hip manipulation." (Tr. 308). He had "relatively little pain." (Tr. 308). Dr. Mathews noted that "[a]t this point, he needs to have his stress despondency from the accident treated and we are trying to arrange a referral for this through our office today. The patient I think will be considerably better once he is treated for this part of his problem also." (Tr. 308). He needed no additional medication. (Tr. 308). There is no indication of any subsequent treatment for Plaintiff's back pain. Development notes from the Bureau of Disability Determination indicate that Plaintiff had no scheduled appointments with his primary care physician as of August 18, 2010. (Tr. 346).

On August 9, 2010, Plaintiff submitted a function report. (Tr. 143). Plaintiff reported that, in a typical day, he would either go to doctor's appointments or "do things around [the] house, wash clothes, clean house, do things around [the] yard, cut grass, do small repairs, [and] clean [the] garage," and sometimes read or watch the news. (Tr. 143). He lived in a house alone and cared for pets. (Tr. 144). He reported that he was unable to sit for more than ten or fifteen

minutes and could not stand for a long time without having to move around. (Tr. 144). With regard to his personal care, he indicated that he "needed to be careful" how he moves but is "otherwise ok" and did not need help caring for himself. (Tr. 144-45). He indicated that he only needed help with house cleaning when he was doing "other things, like house repairs." (Tr. 145). He indicated that he was able to do housework and yard work, but it took him longer than it used to. (Tr. 145). He reported that he goes outside every day and travels by driving a car. (Tr. 146). He reported that he shops for food or "things [he] may need to make repairs." (Tr. 146). He indicated that he was no longer able to water ski, but that he could go boating, fishing, camping, and enjoyed photography and wildlife. (Tr. 147). He wrote that could "lift twenty or thirty pounds," but that squatting and bending hurt and that he could not stand or sit for extended periods of time without changing positions. (Tr. 148). He reported that he uses his back brace and hot compress daily and his TENS unit one to three times per week. (Tr. 149). He reported that "after having shots in [his] back it seemed to lower the intensity of pain for a short while. It is starting to hurt more again." (Tr. 151).

     On September 7, 2010, Dr. Mary Ryczak, M.D., a non-examining state agency physician, reviewed Plaintiff's medical records and other evidence. (Tr. 369). She noted that Plaintiff had a steroid injection in July of 2010, and on August 2, 2010, "reported very little back pain." (Tr. 370). She also noted that Plaintiff left the hospital against medical advice ("AMA") after his admission for chest pain. (Tr. 370). She cited to Plaintiff's ability to drive a car, his report that he can lift twenty to thirty pounds, and the fact that he takes no pain medication. (Tr. 370). She concluded that Plaintiff could occasionally lift up to twenty pounds and frequently lift up to ten pounds, sit for six hours out of an eight-hour workday, stand or walk for six hours out of an

eight-hour workday, and had no postural, manipulative, visual, communicative, or environmental limitations. (Tr. 367-68).

Plaintiff's claim was denied on October 19, 2010. (Tr. 92-96). In Plaintiff's disability appeals report, he indicated that had been no change, for better or worse, in his illnesses, injuries or conditions and that he had no new physical or mental limitations. (Tr. 162). He indicated that he had not seen and would not be seeing a doctor, hospital, clinic or anyone else for the illnesses, injuries or conditions that limit his ability to work. (Tr. 163). He wrote that his illnesses, injuries and conditions had "no effect" on his ability to care for personal needs. (Tr. 164).

On June 20, 2011, Dr. Mathews completed an RFC assessment. (Tr. 371-75). This assessment is difficult to decipher and somewhat illegible. (Id.). Moreover, there is no indication that Dr. Mathews had treated Plaintiff since August 2, 2010, when he reported that the epidural steroid injections improved his pain considerably. (Tr. 308), or since August 9, 2010, when Plaintiff reported that he could lift twenty to thirty pounds and needed no help with his personal care. (Tr. 148).

Specifically, neither the ALJ nor Plaintiff's counsel were able to determine what he noted under "[f]requency and length of contact." (Tr. 18-20, 371). Under clinical findings and objective signs, he appears to note Plaintiff's limited range of motion. (Tr. 371). He indicates that Plaintiff's only treatment had been two courses of physical therapy. (Tr. 371). He did not respond to the question "[i]s your patient a malingerer," but did indicate that emotional factors, specifically anxiety, contribute to the severity of Plaintiff's symptoms and functional limitations. (Tr. 372). He indicated that Plaintiff's symptoms would frequently interfere with his ability to pay attention and concentrate to perform even simple work tasks. (Tr. 372). He did not respond

to the question "[t]o what degree can your patient tolerate work stress." (Tr. 372).

When asked how many city blocks Plaintiff can walk, he wrote "light work." (Tr. 372). He indicated that Plaintiff can only sit for ten minutes before needing to get up and can only stand for ten minutes before needing to sit down. (Tr. 372). He opined that Plaintiff could only stand or walk for less than two hours out of an eight-hour work day. (Tr. 373). The ALJ was unable to determine how much Dr. Mathews opined Plaintiff was able to sit out of an eight-hour work day. (Tr. 373, 43-45). He indicated that Plaintiff would need breaks of fifteen minutes to walk around, but did not indicate how often he needed to take those breaks. (Tr. 373). However, he indicated that Plaintiff would need to take unscheduled breaks once an hour, but did not indicate how long those breaks would last. (Tr. 373). He reported that Plaintiff's legs should be elevated with prolonged sitting, but when asked how high the legs should be elevated, he responded "0," and when asked what percentage of an eight-hour work day the legs should be elevated, he responded "0." (Tr. 373). He indicated that Plaintiff needed to use a cane or assistive device to walk. (Tr. 373). Although "rarely" is defined as less frequent than "occasionally," he opined that Plaintiff could only rarely lift less than ten pounds, but could occasionally lift ten pounds. (Tr. 373). He indicated that Plaintiff could only occasionally look up, down, turn his head right or left, or hold his head in a static position. (Tr. 374). He opined that Plaintiff could only occasionally twist, stoop, crouch, and climb. (Tr. 374). He indicated that Plaintiff had no significant limitations with reaching, handling, or fingering, and that he would be absent from work only one day per month. (Tr. 374). He indicated a date of onset of May 24, 2010, which was the first date on which he saw Plaintiff. (Tr. 303-04, 375).

An ALJ held a hearing on September 16, 2011, at which Plaintiff and a vocational expert

appeared and testified. Plaintiff testified that he was "still seeing" Dr. Mathews. (Tr. 21). He testified that he did not get "very much" relief from the epidural steroid injections. (Tr. 26). Plaintiff stated that he attended physical therapy from September 20, 2010 to October 5, 2010. (Tr. 27). He admitted that he takes only 80 milligrams of aspirin because other medications upset his stomach and that his only other treatment is home exercises. (Tr. 28). He reported that he drove three to five days a week, but that the forty-five minute drive to the hearing had been "very painful." (Tr. 30). He testified that it took him half-a-day to do laundry because he had to keep stopping and taking rests. (Tr. 31). He testified that pain down his legs had caused him to fall four times while trying to get up. (Tr. 32). He admitted that he was the only person to take care of his house, but that he had been unable to cut his grass more than three times that summer because of his pain. (Tr. 34). He testified that he was unable to shovel when it snowed. (Tr. 35). He testified that he was able to perform his personal care, but that bending over the sink is painful. (Tr. 36). He stated that he has to sit and stand very frequently, and cannot sit, stand, or walk for more than fifteen minutes. (Tr. 37). He testified that he spends his days sometimes "doing things in the garage," such as painting a birdfeeder. (Tr. 38).

The ALJ presented two hypotheticals to the VE. The VE testified that under the first hypothetical, which encompassed the ALJ's RFC assessment described below, Plaintiff would be unable to engage in his past relevant work but would be able to engage in work in the national economy as a small products assembler, machine tender, and inspector. (Tr. 41-42). The VE testified that under the second hypothetical, which encompassed Dr. Mathews' opinion, Plaintiff would not be able to engage in work in the national economy. (Tr. 44-45).

The ALJ entered a decision on November 7, 2011. At step one, the ALJ found that

Plaintiff was insured through December 31, 2013 and has not engaged in substantial gainful activity since January 14, 2010, the alleged onset date. (Tr. 81). At step two, the ALJ found that Plaintiff's degenerative disc disease of the cervical spine and degenerative disc disease of the lumbar spine were medically determinable and severe. (Tr. 81). The ALJ found that Plaintiff's chest pain and adjustment disorder were medically determinable but non-severe. (Tr. 81-82). At step three, the ALJ found that Plaintiff did not meet or medically equal a listed impairment. (Tr. 82). Prior to proceeding to step four, the ALJ assessed Plaintiff's RFC. (Tr. 83-86). The ALJ found that Plaintiff could engage in light work, lifting up to twenty pounds occasionally and ten pounds frequently, standing and walking for six hours out of an eight-hour workday, sitting for six hours in an eight-hour workday, with no postural limitations except limited to occasional climbing of stairs or ramps, emergent climbing of ladders, scaffolds, or ropes, and excluded from working at unprotected heights. (Tr. 83-86). At step four, the ALJ found that Plaintiff could not engage in past relevant work (Tr. 86). At step five, the ALJ found that Plaintiff could engage in other work, such as a small products assembler, machine tender, and inspector. (Tr. 86-87).

In assessing Plaintiff's RFC, the ALJ assigned great weight to Dr. Ryczak's opinion, little weight to Dr. Mathews' opinion, and discounted Plaintiff's credibility. The ALJ discounted Dr. Mathews' opinion for four reasons. First, it was internally inconsistent regarding standing and walking tolerances. (Tr. 85). Second, it was "somewhat incoherent." (Tr. 85). Third, it was inconsistent with Plaintiff's reported abilities. (Tr. 85). Fourth, it was inconsistent with the course of treatment provided by Dr. Mathews and sought by Plaintiff. (Tr. 85). The ALJ rejected Plaintiff's credibility for three reasons. First, the ALJ noted that Plaintiff stopped working when he was laid off, not when he was injured. (Tr. 85). Second, the ALJ noted that Plaintiff's

testimony greatly exceeded his prior self-report and the limitations indicated in the medical evidence. (Tr. 85). Third, the ALJ noted that Plaintiff took only over-the-counter pain medications and had refused treatment. (Tr. 86).

The Court notes that Plaintiff submitted an additional treatment note from Dr. Mathews from June 22, 2013 to the Appeals Council. (Tr. 7). Evidence that was not before the ALJ may only be used to determine whether it provides a basis for remand under sentence six of section 405(g), 42 U.S.C. ("Sentence Six"). Szubak v. Secretary of Health and Human Servs., 745 F.2d 831, 833 (3d Cir. 1984). Sentence Six requires a remand when evidence is "new" and "material" if the claimant demonstrated "good cause" for not having incorporated the evidence into the administrative record. Id. In order to be material, "the new evidence [must] relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition." Id. The relevant time period is "the period on or before the date of the [ALJ's] hearing decision." 20 C.F.R. § 404.970(b); Mathews v. Apfel, 239 F.3d at 592. Here, the new evidence does not relate to the relevant time period. Thus, the Court will not remand pursuant to Sentence Six and will not consider the June 22, 2013 treatment note.

### VI.    Plaintiff Allegations of Error

#### A.    The ALJ's failure to assign controlling weight to Dr. Mathews' opinion

Plaintiff asserts that the ALJ was "required to give controlling weight to Dr. Mathews' opinion" because it was supported by objective evidence of multilevel disc degeneration in his cervical spine causing moderate compression. However, controlling weight may only be assigned when a treating source opinion is "well-supported by medically acceptable clinical and

laboratory diagnostic techniques <u>and is not inconsistent with the other substantial evidence in [the] case record</u>." 20 C.F.R. § 416.927(d)(2) (emphasis added).

Section 404.1527(c) establishes the factors to be considered by the ALJ when the opinion of a treating physician is not given controlling weight. Under subsections (c)(1) and (c)(2), the opinions of treating physicians are given greater weight than opinions of non-treating physicians and opinions of examining physicians are given greater weight than opinions of non-examining physicians, as discussed above. Subsection 404.1527(c)(2) also differentiates among treating relationships based on the length of the treating relationship and the nature and extent of the treating relationship. Subsection 404.1527(c)(3) provides more weight to opinions that are well supported, which means that "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion." Subsection 404.1527(c)(4) states that "the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion." Subsection 404.1527(c)(5) provides more weight to specialists, and subsection 404.1527(c)(6) allows consideration of other factors which "tend to support or contradict the opinion."

Here, the ALJ discounted Dr. Mathews' opinion for four reasons, each of which provides substantial evidence. First, Dr. Mathews' opinion was internally inconsistent regarding standing and walking tolerances. (Tr. 85). Dr. Mathews opined that Plaintiff could not stand for more than ten minutes at a time, but indicated that he needed to be able to walk around for fifteen minutes on breaks. (Tr. 373). He seemed to opine that Plaintiff would be unable to sit or stand for more than two hours combined in an eight-hour day, but also opined he would only be absent from

work one day per month as a result of his impairments. (Tr. 374). Second, it was "somewhat incoherent." (Tr. 85). When asked how many city blocks Plaintiff can walk, Dr. Mathews wrote "light work." (Tr. 372). He reported that Plaintiff's legs should be elevated with prolonged sitting, but when asked how high the legs should be elevated, he responded "0," and when asked what percentage of an eight-hour work day the legs should be elevated, he responded "0." (Tr. 373). The ALJ was correct in describing these aspects of the opinion as internally inconsistent and incoherent. Thus, opinion was not "well-supported." 20 C.F.R. 404.1527(c)(3).

Third, it was inconsistent with Plaintiff's reported abilities. (Tr. 85). The ALJ explained:

> [Plaintiff] was generally capable of tending to his personal care, preparing simple meals, driving, shopping in stores, boating, fishing, enjoying photography, camping, and walking. He can do laundry, clean, perform outside work, mow his grass, do household repairs, clean his garage, read, watch television, care for his pets, and paint birdhouses. It is also noted that the [Plaintiff] lives alone and has not reported any particular help in maintaining the residence.

(Tr. 85). The ALJ correctly characterized Plaintiff's function report and his testimony. (Tr. 21, 36, 38, 143-152). These are inconsistent with Dr. Mathew's opinion that Plaintiff could only rarely lift less than ten pounds and never lift more than ten pounds and his opinion that Plaintiff could not sit, stand, or walk for more than fifteen minutes. These inconsistencies are also proper bases for rejecting Dr. Mathews' opinion. 20 C.F.R. § 404.1527(c)(4) ("[T]he more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").

Fourth, his opinion was inconsistent with the course of treatment provided by Dr. Mathews and sought by Plaintiff. (Tr. 85). Dr. Epstein explained that Plaintiff "declined all treatment options. Recommended consideration for non-steroidals, physical therapy, chiropractic acupuncture, and injections; [Plaintiff] declined them all." (Tr. 335). He also noted that Plaintiff was "requesting note to stay out of work at infinitum. I did not feel comfortable doing this

because he was declining any and all treatment recommendations." (Tr. 335). Dr. Mathews prescribed only three epidurals, which improved Plaintiff's pain considerably, and did not otherwise treat Plaintiff. (Tr. 308). Although Plaintiff had received a course of three epidurals and two courses of physical therapy, he treated himself with aspirin and home exercises throughout the majority of the relevant period. (Tr. 28).

The Third Circuit has held that conservative treatment can constitute an inconsistency sufficient to reject a treating source opinion pursuant to §404.1527(c)(4):

> Dr. Miller opined that Salles's back pain, Hepatitis C, and gall bladder disease were "currently" disabling. However, the ALJ properly noted that Dr. Miller's opinion was not supported by the other medical evidence of record—which showed that Salles never had gall bladder surgery or a liver biopsy—and was contradicted by his own treatment notes, in which he considered her overall prognosis to be "good." In contrast, Dr. Roque recognized that although Salles suffered from these ailments, they did not preclude her from working full-time. Dr. Roque's opinions were more consistent with the medical records, which confirm that Salles was not taking medication for her Hepatitis, and that conservative treatment of her gall bladder disease and back pain alleviated her symptoms. Because the consultative physician's observations were more consistent with the weight of the evidence, the ALJ properly afforded them greater weight than the opinion of the treating physician. See 20 C.F.R. § 416.927(d)(4).[1]

Salles v. Comm'r of Soc. Sec., 229 F. App'x 140, 148-49 (3d Cir. 2007). In contrast to Dr. Mathews' opinion, Dr. Ryczak's opinion was consistent with Plaintiff's abilities, such as his self-reported ability to lift twenty to thirty pounds. (Tr. 144). A reasonable mind could accept the ALJ's reasoning as adequate to reject Dr. Mathew's opinion. Thus, substantial evidence supports the ALJ's assignment of weight.

The Court notes that it is concerned with the development of the record in this case. Although Plaintiff testified that he was "still seeing" Dr. Mathews at the time of his September 9, 2011 hearing (Tr. 21), the record contains no evidence of visits with Dr. Mathews after August 2,

---

[1] 20 C.F.R. § 416.927(d)(4) governs SSI, while 20 C.F.R. § 404.1527(c)(4) governs DIB.

2010. Similarly, Plaintiff testified that he attended physical therapy in September and October of 2010 (Tr. 27), but no physical therapy records for this period exist in the record. Given the ALJ's reliance on Plaintiff's conservative treatment, a failure to obtain treatment records could have violated the ALJ's duty to develop the record. See, e.g. Smith v. Harris, 644 F.2d 985, 989 (3d Cir.1981); Hess v. Secretary of Health, Education and Welfare, 497 F.2d 837, 841 (3d Cir.1974). However, Plaintiff has not asserted this an error and has not provided any evidence that Plaintiff received treatment from Dr. Mathews subsequent to August 2, 2010. Nor has Plaintiff advanced any other allegation of error. Consequently, the Court concludes that substantial evidence supports the ALJ's step five determination.

## VIII.    Conclusion

Therefore, the Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1382c; Brown, 845 F.2d at 1213; Johnson, 529 F.3d at 200; Pierce, 487 U.S. at 552; Hartranft, 181 F.3d at 360; Plummer, 186 F.3d at 427; Jones, 364 F.3d at 503. Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla of evidence. It does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971). Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands. Monsour Med. Ctr., 806 F.2d at 1190. Here, a reasonable mind might accept the relevant

evidence as adequate. Accordingly, the Court will affirm the decision of the Commissioner pursuant to 42 U.S.C. § 405(g).

An appropriate Order in accordance with this Memorandum will follow.

Dated: September 4, 2014                                      s/Gerald B. Cohn
                                                           GERALD B. COHN
                                                  UNITED STATES MAGISTRATE JUDGE